Filed 10/2/15  P. v. Aguilera CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>RONY AGUILERA et al.,<br><br>        Defendants and Appellants. | A140128<br><br>(San Francisco County<br>Super. Ct. No. 218652) |

Defendants Rony Aguilera and Marlon Rivera were members of the MS-13 gang. On July 30, 2008, a relative of an MS-13 gang member was shot by a member of the Norteño, a rival gang.  Members of MS-13 quickly met and vowed revenge.  And in the early morning hours of July 31, five MS-13 gang members confronted 14-year-old Ivan Miranda and his two young companions, Natalie Linares and Alejandro Flores, the upshot of which was the murder and robbery of Miranda and the robbery of his companions.

Aguilera and Rivera were tried jointly, and a jury convicted them of six felonies, including first degree murder.  The jury also found true gang benefit allegations.  Rivera was sentenced to 36 years to life, Aguilera 35 years to life.

Aguilera and Rivera both appeal, arguing one substantive issue:  that the trial court erred in not granting a new trial, or at least holding an evidentiary hearing, based on claimed juror misconduct.  We reject the contention, concluding there was no error, and certainly no prejudice.

1

Defendants also contend that the 10-year-term imposed for the gang-participation enhancement (Pen. Code, § 186.22, subd. (b)(5)) was unauthorized and must be stricken.[1] The People agree, so we will affirm the judgments with this modification.

## BACKGROUND

### Introduction

The trial here involved the all-too-frequent gang retaliation killing, in a setting that presented the trial court with many sensitive, and frequently troublesome, pretrial and trial issues. That setting includes the fact that the trial was set for early June 2013, not long after a high visibility, high profile, four-month trial involving the mistaken-identity revenge killing of a father and two sons by a member of the MS-13 gang. Many of the witnesses expected to testify in this case had prior criminal records, including some who had suffered convictions in connection with the very incident involved here. And Roberto Acosta, the key prosecution witness, admitted to having been involved in no fewer than nine homicides in his native Honduras. In short, many complications were anticipated.

The case was assigned to the Honorable Harold Kahn for trial. Judge Kahn devoted some five days to dealing with numerous pretrial and possible trial issues, including severance; evidentiary issues surrounding in-custody statements and gang-related testimony; in limine motions; and Evidence Code section 402 hearings. Then, following lengthy jury selection, the trial proceeded for eight days.

The significance of all this is that in this highly charged case with its many issues, on appeal defendants assert no claim of error in connection with the case from the first day of pretrial to concluding instructions. From beginning to end, it was a well-conducted trial.

### The Charges and The Evidence

Aguilera and Rivera were both charged with seven felonies, all committed on July 31: (1) first degree murder of Miranda (§ 187); (2) robbery of Miranda (§ 211); (3) robbery of Flores; (4) attempted robbery of Linares (§§ 211, 664); (5) participation in a

---

[1] All further unspecified statutory references are to the Penal Code.

2

criminal street gang (§ 186.22, subd. (a)); (6) conspiracy to commit assault with a deadly weapon (§ 182, subd. (a)(1)); and (7) conspiracy to obstruct justice (§ 182, subd. (a)(5)). All charges except participation in a criminal street gang were alleged to have been committed for the benefit of a criminal street gang. (§ 186.22, subd. (b).) The information further alleged that both defendants used deadly weapons in the commission of the murder and robbery of Miranda. (§ 12022, subd. (b)(1).)

As noted, Aguilera and Rivera assert only one substantive issue on appeal: claimed error with how Judge Kahn dealt with what defendants asserted in motions for new trial was juror misconduct. That claim of error has little to do with most of the evidence in the case, and we thus recite the evidence in a general way.

Aguilera and Rivera were members of the MS-13 gang. MS stands for Mara Salvatrucha, a reference to El Salvador; 13 represents MS-13's affiliation with Sureño. On July 30, 2008, the father of MS-13 gang member "Pistolita" (Pistolita) was shot by a member of the Norteño, a rival gang, and some MS-13 gang members quickly met to plot revenge. The MS-13 members who met included Aguilera, Rivera, Acosta, Cesar Alvarado ("Momia"), Walter Chinchilla ("Demonio"), and Pistolita.

Some specifics concerning the revenge meeting were confirmed by the testimony of Jose ("Chiqui") Espinal, another MS-13 gang member, who testified in exchange for a letter of recommendation to the federal judge before whom Espinal had pleaded guilty to five charges. Espinal testified that in 2008 Pistolita's father was shot during a confrontation with rivals who sold fake green cards in the Mission District. When MS-13 gang members learned that Pistolita's father had been shot, they attributed the shooting to Norteños, and planned to retaliate. Asked how he knew, Espinal testified he was "there when it was planned." Sometime after the meeting, Espinal phoned Rivera and told him to get ready, as other gang members would come by to pick him up. Espinal himself had to go to work.

Early the next morning, July 31, at approximately 1:15 a.m., 14-year-old Miranda left his house to meet his 17-year-old friend Linares, telling his father he was going to return Linares's iPod. Miranda met Linares and her friend, Flores, at the intersection of

Persia Avenue and Lisbon Street at about 1:30 a.m. Miranda had red shoelaces in his sneakers, the color associated with the Norteño gang.

The three of them walked toward Linares's house, when Linares noticed four men approaching. The men walked past them at first, then turned back and headed toward them. Flores recognized one of the four men as Rivera, who went to the same school as he and his companions. Flores noticed a fifth man who seemed to be texting or calling someone.

When the four approached, they produced knives, one of them said, "check them," and asked whether Miranda and the others had iPods or phones, which they then took. Two of the men held knives against Flores, one of whom flashed an MS-13 gang sign. Two others, including Rivera, pointed knives at Miranda, who broke free and ran, pursued by two gang members. Moments later, Linares and Flores saw Miranda on the ground, stabbed in the chest, neck, arm, and back. Miranda was taken to San Francisco General Hospital, where he died from his stab wounds. The iPod he brought to the scene was never recovered.

A little after 1:30 a.m., Espinal called Rivera and asked him "what's up." Rivera said "a little fish had fallen"—"that long hair little guy from school . . . Ivan Dude."

On July 31, the day of the murder, Aguilera contacted Acosta, a fellow gang member who was also a tattoo artist, told him about the murder, said that he and Rivera had earned gang tattoos for the murder, and asked him to tattoo them. Acosta did that. And much more.

### The Recordings and the Translations

Acosta was a confidential informant who had for some three years been working with the Department of Homeland Security (DHS), in a relationship with Agent John Moore. Using a concealed digital recorder provided to him by the DHS, Acosta recorded conversations with MS-13 gang members Aguilera and Rivera (along with Demonio) regarding the murder of Miranda. Those recordings, and their translations, became significant pieces of evidence at trial.

4

Acosta made the recordings while riding in a car with defendants the day of the murder and at a tattoo session later that same day. Both of the recordings were in Spanish and were played in segments for the jury, while Acosta, through an interpreter, testified to their content and identified the various speakers. For each recording, the jury was provided with two transcripts introduced in the People's case, a first draft and a final draft, which contained the statements in Spanish, each statement's speaker, and a side-by-side English translation of each statement.

How those transcripts came to be, and ultimately came to be admitted in evidence, was the subject of much testimony before Judge Kahn, testimony that began with pretrial Evidence Code section 402 hearings. The genesis of the hearings included a concern by defense counsel that Acosta might not appear at trial, presenting an issue whether the transcripts could be mentioned by the prosecutor in opening statement.

On the afternoon of June 13, Judge Kahn held a 402 hearing with Acosta, who testified through a Spanish interpreter. The next morning, in the course of argument about the transcripts, Judge Kahn made this observation that led to the following colloquy:

"THE COURT: I'm just going to cut through this. Because the tape recording is in Spanish, we need to have one or more transcripts in evidence. It is permissible, although not ideal, to have multiple transcripts. And then the—to the extent that there's disagreement about the transcripts, you take testimony, and the jury will decide based on that testimony what the actual transcripts are.

"It is correct that through Mr. Acosta alone it's probably—the foundation is not likely to be laid, but I'm hearing Ms. Trevisan [the prosecutor] also calling Special Agent Moore. . . .

"MS. TREVISAN: That's correct.

"MR. WHELAN [counsel for Rivera]: That's correct.

"THE COURT: And possibly even the interpreter.

"MS. TREVISAN: The linguist actually, yes.

"THE COURT: I'm expecting that there's going to be at least one transcript that's going to be introduced. The jury is going to be instructed that they need to not make their own determination of what's said, even if they have Spanish skills. I think that's the undeniable law. How it plays out, stay tuned.

"MR. WHELAN: That seems reasonable. I haven't thought through that scenario. I appreciate the Court has. That begs the question, then, of either we stipulate—you know, how do we deal with it in terms of opening statement.

"THE COURT: That one is easy. I have—I don't mean to flatter you—the three of you—nor do I mean to do anything to disparage you, but I think I have three experienced attorneys who understand that they need to act in good faith. And if they act in good faith, they may proceed. So, put in plain English, if you have a good-faith belief that evidence will come in, it is almost certain that I will allow you to use it in opening statements.

"MR. SIMERLY [counsel for Aguilera]: Based upon what you know now and what you've seen now, what is your ruling with regards to [the prosecutor] using the Acosta stuff in opening?

"THE COURT: That she may."

The background testimony supporting Judge Kahn's conclusion included Acosta's testimony that he met on numerous occasions with Agent Moore to prepare the transcripts: it took "many days and some nights and many hours."

Agent Moore later testified at length about the efforts undertaken in preparing the original transcript, including that he met with Acosta on several days and nights listening to the tapes and working with him to prepare the transcript—a transcript Moore "assisted in the creation of with Mr. Acosta and the linguist." And, Moore said, the transcript is an "accurate representation of . . . what was said."

The actual transcripts were prepared by Brenda Rodriguez, a certified linguist who was the official linguist for the DHS investigation, who also testified about their preparation. Finally, MS-13 gang member Espinal also listened to a recording of the conversation and identified the voices of Aguilera and Rivera.

6

Based on all that, the transcripts were admitted in evidence. Then, with Acosta on the stand, the prosecutor stated she was "going to ask [Acosta] a little bit about [a] part of the recording." Judge Kahn interrupted: "Before you do, I'd like to tell the jury just a little bit," and he said this:

"So ladies and gentlemen, earlier in this trial when we had a witness for the first time who was accompanied by a Spanish interpreter, I told you that regardless of whether you could, yourself understand the Spanish spoken by the witness, you must accept the interpretation by the court-certified interpreter as correct. And that is true also for Mr. Acosta and every witness who testifies through a Spanish interpreter. But that is different from an audiotape that's in Spanish that is being translated.

"You've heard the testimony of that translation was done, in whole or in part by a person that's been referred to as a 'federal linguist.'

"You may not use your Spanish abilities, if you have any, to test that interpretation or translation by the federal interpreter, but you are not bound to accept the interpretation. It's a matter of evidence. Like any other piece of evidence, you may choose to accept some or all or none of the interpretation as accurate.

"There may be further evidence in this case that will indicate that some or all of the transcript, as it relates to the Spanish-to-English transcription, is not accurate.

"But I just want to distinguish between those two types of Spanish to English. One you are bound to accept, which is the in-court, court-certified interpreter's translation of witnesses; another, which is a matter of evidence which you can choose whether to accept or not."

As will be seen, Judge Kahn's "little bit" of advice was the sum total of what the jury was told about any evaluation of the transcript.

In the transcript from the recording of the conversation during the car ride, the following translated statements were attributed to Aguilera, each statement referring to the events of the previous evening and the murder of Miranda. [*Any changes in statements between the first and final draft are indicated.*]

7

- "We stabbed that son of a bitch" [*final draft*: "We took that son of a bitch down from side to side" ]

- "The dude just fell and died right in front of, right in front of the homeboy dog." [*final draft*: "The dude just fell stretched out right in front of, right in front of the homeboy dog."

- "I had like a, a Chinese style sword dog."

- "And I positioned it crazy, and it just slid in, like this!"

- ". . . I even felt my hand go in dog."

- "I stuck it all the way in dude, right here, look!"

- "We were following him to stab him even more dude."

- "I stabbed him, I stabbed him like 3 times in the heart and then I stabbed him a bunch of times back here crazy." [*final draft*: "I stuck him, I stuck him like three times in the heart, and then I stuck him a bunch of times back here crazy."]

- "Look here, I got 80 bucks for the iPod dog"

- "Fuck that's what I like doing dude, right? Robbing mother fuckers." [*final draft*: "Fuck that's what I like doing dude, right? Searching mother fuckers."

According to Acosta, Rivera was also in the car during these discussions and the following statements were attributed to him:

- "We even hide the knife."

[Aguilera interjected: "We have to go get that shit dog."]

- Rivera: "Yeah dude because all my fingerprints are on it since I didn't wear gloves."

- "Hey, what made me laughs is how he went down; he even closed his legs, and then dropped dead, like this look! [LAUGHS]." [*final draft*: "Hey, what made me laugh is how he went down; he even closed his legs, and then dropped, balled up, like this look! [LAUGHS]."

Later in the car ride recording, Acosta identified Rivera as saying that Linares and Flores, the two people with Miranda the night of his murder, recognized Rivera from

8

school, as Flores apparently asked Rivera, " 'Why are you checking me if I know you?' " In the car, Acosta asked Rivera, "The guy recognized you?," to which Rivera responded, "Yes, yes, he saw my face . . . we went to school together and we got into a fight once there too." Here, Aguilera jumped in to say "Yeah, I went to school with them too dog."

In the second recording, at the house where Acosta tattooed Aguilera and Rivera, Acosta identified Rivera as saying: "This dude, these dudes fucked up because all they did was take [Miranda's] iPod and slightly stabbed him, and [Flores] recognized me, he is out with the narcs right now." Rivera, Acosta, and Aguilera (along with a few other members of the gang) go on to discuss having someone vouch for their whereabouts the night of the crimes, in order to provide alibis for each of them.

As will be discussed, the defense presented the testimony of Elizabeth McCarthy, a certified court interpreter, who prepared her own transcript of the conversations. McCarthy testified that in places the tape was muddled, with voices overlapping. So, in the words of Aguilera's brief, in some instances McCarthy was "unable to differentiate between one voice and another."

Following closing arguments and final instructions, the jury retired to deliberate. The jury was provided with audio files of the recordings, the first draft of People's transcript of the recordings (People's Exhibits 77-79), the final draft of the People's transcript (People's Exhibits 77A, 78A, 79A), and the defense transcript prepared by McCarthy.

The jury found both Aguilera and Rivera guilty on all six charges presented.[2] The jury found true the gang enhancements.

**Postverdict Developments and Motions for New Trial**

Aguilera and Rivera both filed motions for new trial. As pertinent here, one of the grounds asserted was juror misconduct of Juror No. 10 who, in the words of Aguilar's brief here, "violated the court's instruction prohibiting the jurors from relying on their Spanish speaking capability in evaluating the transcript of the conversation recorded on

---

[2] The People dismissed the conspiracy to obstruct justice charge.

9

Acosta's body wire." The motions were supported by declarations from Jurors Nos. 6 and 8. Rivera's attorney Whelan also submitted a declaration relating a claimed comment from Juror No. 3.

In her declaration, Juror No. 6 recounted that "Juror #10 understood and spoke Spanish. I observed Juror #10 spent [*sic*] a lot of the deliberations listening to both the undercover wire dialogue between the defendants and reading the 'text' messages, stored on the green thumb drive, between the defendants and their friends. Juror #10 was listening to the tapes as well as reading the translations on the screen. During deliberations Juror #10 assisted the non-Spanish speaking jurors with their review of the undercover wire transcripts/translations. As jurors read the government's transcripts/translation, Juror #10 confirmed to the other jurors that the Spanish-English translations were correct." Additionally, Juror No. 6 indicated that "Juror #10 would confirm any portions of the transcripts the non-[Spanish] speaking jurors would inquire about."

In an addendum to Rivera's motion, attorney Whelan submitted a declaration from Juror No. 8 which provided among other things that Juror No.10 told the rest of the jury that "if [they] didn't understand or speak Spanish that [they] were at a disadvantage because as she listened to the tape, and did her own translation, there was no doubt in her mind that [Aguilera] was the one who did the stabbing." Juror No. 8 said that as Juror No. 10 "proceeded to translate what she was hearing [Juror No. 8] commented to the group that [she] did not think it was appropriate for [Juror No. 10] to be doing any translating and that [the jurors] were limited to the written documents that were already translations approved as evidence. [Juror No. 8] was not comfortable with Juror #10 taking it upon herself to translate and interpret portions of the audio tape."

Defense attorney Whelan also filed a declaration that purported to testify to an interview he conducted with Juror No. 3. According to him, Juror No. 3 "stated that Juror #10 did have the headphones on frequently and 'confirmed' for other jurors the 'tone and inflection' of the Spanish-speaking wire recordings that she was listening to. [Juror No. 3] did not hear Juror #10 actually translate/interpret anything for other jurors."

10

The motions for new trial contended that Juror No. 10's conduct—which Rivera's motion described as "failing to rely on the court interpreter's translation"— constituted juror misconduct. Thus a new trial should be granted or, at the least, an evidentiary hearing held to explore the matter.

The People filed vigorous opposition to the motions for new trial.

The motions came on for hearing on August 29, 2013, which began with Judge Kahn's observation: "My tentative view is to deny the motions on the grounds that, even assuming that there was any jury misconduct, which I think, at best, is questionable, that there's been no showing that arises to the level of what the cases talk about as prejudice or as any kind of reasonable likelihood that the conduct complained of has caused there to be an unfair trial or that in a new trial there would be any different result."

Rivera's attorney Whelan pressed on, asking Judge Kahn to reconsider, stating that he thought "a further investigation and evidentiary hearing would be appropriate to rule in or rule out the issue of whether there was any reliance and, if so, to what extent there was reliance on whatever Juror No. 10 said . . . with reference to her own Spanish translations—of the evidence." Doing so, Whelan candidly acknowledged that he "would agree that the record from the affidavits does not at this stage show what, if any, reliance was—if any jurors relied on number 10 and whatever she said to the others. [¶] I would agree that the affidavits at this stage do not create a presumption or anything close to it of prejudice. I do think that the affidavits create a clear record that juror no. 10 engaged in misconduct by using her own Spanish fluency, at a minimum, to independently evaluate the evidence based on her Spanish fluency. So it certainly would have influenced her."

At the conclusion of arguments, Judge Kahn denied the motions, determining as pertinent here "that there was no prejudice resulting from any juror misconduct."

Judge Kahn sentenced Aguilera to 36 years to life, comprised of 25 years to life for first degree murder, plus one year for the weapon use allegation and 10 years for the gang benefit enhancement. Sentence was imposed but stayed on the remaining counts.

11

Rivera was sentenced to 35 years to life, calculated the same way, but without the weapon use enhancement.

## DISCUSSION

### Juror No. 10 Did Not Violate Any Instruction

Aguilera's brief states his contention this way: "Juror affidavits revealed that Juror number ten, a Spanish speaking juror, violated the court's instruction prohibiting the jurors from relying on their Spanish speaking capability in evaluating the transcript of the conversation recorded on Acosta's body wire."

Rivera's contention is similar: "The juror's misconduct violated the trial court's instructions prohibiting jurors from engaging in their own translation or interpretation of Spanish language recordings or text messages."

We begin with the observation that the contentions cannot succeed, as there was no instruction.

CALCRIM 121 is entitled "Duty to Abide by Translation Provided in Court." Alternative A in that instruction addresses "foreign language testimony." Alternative B addresses "foreign language recording."[3] The Bench notes for instruction no. 121 provide in their substantive entirety as follows:

"**Instructional Duty**

"The committee recommends giving Alternative A of this instruction whenever testimony will be received with the assistance of an interpreter, though no case has held that the court has a sua sponte duty to give the instruction. The instruction may be given at the beginning of the case, when the person requiring translation testifies, or both, at the court's discretion. If the jury may hear a recording that is at least partially in a foreign

---

[3] "You (may/are about to) hear a recording [that is partially] in a foreign language. You will receive a transcript with an English language translation of that recording. [¶] You must rely on the transcript, even if you understand the language in the recording. Do not share your own translation with other jurors. Please write a note to the clerk or bailiff if you believe the translation is wrong. [If the recording is partially in English, the English parts of the recording are the evidence.]"

language, the court may give Alternative B with the appropriate bracketed language, as needed.

"If the court chooses, the instruction may also be modified and given again at the end of the case, with all other instructions. [¶] It is misconduct for a juror to retranslate for other jurors testimony that has been translated by the court-appointed interpreter. (*People v. Cabrera* (1991) 230 Cal.App.3d 300, 303 [(*Cabrera*)]) 'If [the juror] believed the court interpreter was translating incorrectly, the proper action would have been to call the matter to the trial court's attention, not take it upon herself to provide her fellow jurors with the "correct" translation.' (*Id*. at p. 304.)"

The record does not contain all the instructions requested here. What it does contain reveals that neither defendant requested CALCRIM 121. And the reporter's transcript shows that Judge Kahn did not give it.

As indicated, the only statement to the jury was in Judge Kahn's comment to the jury before the prosecutor began questioning Acosta about a portion of the transcript, where Judge Kahn said that "You may not use your Spanish abilities, if you have any, to test that interpretation or translation by the federal interpreter, but you are not bound to accept the interpretation." That was not an instruction.

A leading practical treatise makes the point, in an introductory paragraph in the chapter on jury instructions: "**Compare—court admonitions during trial**: The court may make various admonitions during trial *advising* or *cautioning* the jurors about their duty or conduct as jurors [citation], or the purpose for which admitted evidence may be considered [citation], or to disregard certain comments or conduct by counsel [citation], etc. However, such admonitions do not provide jurors with the *law* applicable to the case." (Wegner et al., Cal. Practice Guide: Civil Trials & Evidence (The Rutter Group 2014) ¶ 14:4, p. 14-2.)

But even assuming Judge Kahn's admonition could be considered an instruction, defendants' contentions cannot succeed. There are several reasons why, beginning with the fact that their contentions misstate what happened here.

13

**There Was No Misconduct**

As to Aguilera's argument, the jurors were not told they could not rely on their language capability to "evaluate" the transcript. To the contrary, as quoted above what Judge Kahn told them was this: "You may not use your Spanish abilities, if you have any, to test that interpretation or translation by the federal interpreter, but you are not bound to accept the interpretation. It's a matter of evidence. Like any other piece of evidence, you may choose to accept some or all or none of the interpretation as accurate. [¶] There may be further evidence in this case that will indicate that some or all of the transcript, as it relates to the Spanish-to-English transcription, is not accurate. [¶] But I just want to distinguish between those two types of Spanish to English. One you are bound to accept, which is the in-court, court-certified interpreter's translation of witnesses; another, which is a matter of evidence which you can choose whether to accept or not." Put otherwise, the jurors were in essence affirmatively told to "evaluate." After all, what was the purpose of the headphones given the jury if not to listen to the tapes, tapes that were all in Spanish? She did not "engage in her own translation."

As to Rivera's argument, it misstates what Juror No. 6 said Juror No. 10 did. In sum, the arguments in defendants' briefs cannot prevail.

In any event, in light of the applicable law, Judge Kahn's ruling was correct.

The first inquiry is to determine whether there was misconduct. (*People v. Collins* (2010) 49 Cal.4th 175, 242.)[4] Judge Kahn did not actually answer this question, noting only that "even assuming that there was any jury misconduct, which I think, at best, is questionable . . . ." As Aguilera candidly acknowledges, Judge Kahn "did not rule on whether there had been misconduct." We do, and conclude there was not.

---

[4] Some cases say there is a three-step process, the first of which is to determine the admissibility of the juror affidavits. (*People v. Vallejo* (2013) 214 Cal.App.4th 1033, 1042; *People v. Bryant* (2011) 191 Cal.App.4th 1457, 1467.) The Attorney General does not contest the admissibility here. Neither will we, other than to note that attorney Whelan's statement as to what Juror No. 3 told him is clearly hearsay, and some of the content of the declarations from Jurors Nos. 6 and 8 may be considered subjective considerations that would not meet the criteria established for impeachment of a verdict. (See *People v. Hutchinson* (1969) 71 Cal.2d 342, 349.)

As indicated, the tapes themselves were sent to the jury room, along with headphones by which the jury could listen to them. How could it be error to listen to the tapes? And if the jurors were allowed to listen to the tapes, what were they supposed to do with what they heard? Not only were the jurors provided the tapes and the headphones to listen to them and evaluate them, they were told by Judge Kahn to do just that—advice hammered home by the closing arguments of counsel.

The prosecutor argued the facts as reflected on the tapes, and urged the jury to "Listen to the wire." "[Y]ou can and you will have [the tape] in the back with you."

Counsel for Rivera argued at some length about this and the claimed significance of the differences in the prosecution and defense transcripts, concluding with his argument: "What about the Acosta transcripts? [¶] I told you already that there are three different versions. . . . [¶] . . . We have Brenda Rodrigues, a very, obviously, dedicated I.C.E. employee. And we have Elizabeth McCarthy, a federal-state-certified in-court interpreter, trained, certified, no ax to grind whatsoever. [¶] There are multiple areas that Elizabeth found were unintelligible that you will find the federal transcriber puts in straightforward wording, most of which is incriminating."

Rivera's counsel then went on for several pages highlighting what he claimed were the "significant points of difference between the federal transcript and Elizabeth's transcript," going on to identify some of them, the ones his translator found "unintelligible." Finally, counsel urged, "I will strongly encourage you to listen to it, because these are critical statements that the prosecution is relying on. [¶] This is, of course, if you are going to give any weight whatsoever to the Acosta transcript. That's why I'm going through this. You could give it no weight, if you wanted to. You could give it little weight. You will be instructed on that. But if you are going to give it some significant weight, I ask that you go through these differences closely."

As to this, we first note that if the primary claim of inconsistency was whether something on the tape was unintelligible or not, certainly a juror listening to the tape could make that determination for him- or herself. The side-by-side transcriptions gave the jurors the tools to evaluate whether what was heard on the tape was accurately

15

transcribed. That is a determination that jurors were instructed to make, with their hearing of the tape prevailing over anyone's written transcription. Judge Kahn told the jurors they were to evaluate the parts of the translation they found to be accurate. So, too, did the lawyers. There was no misconduct.

But even assuming there were, it did not prejudice defendants. There is no substantial likelihood that one or more jurors was biased by Juror No. 10's focus on the tape or any expression of hers that supported the accuracy of the transcription. Whatever few words Juror No. 10 said to show that she believed the transcription to be accurate focused the attention of those listening to it, which Judge Kahn directed them to do.

Moreover, the evidence against both defendants was overwhelming, much of it out of their own mouths—and not just on the tapes. Moments after the killing, Rivera boasted of his exploits to Espinal. He was also identified by an eyewitness. Voluminous telephone records placed Aguilera at the scene, and in the thick of the calls and messaging among the participants and other gang members. And Acosta testified that he gave both men the tattoos that Aguilera claimed he and Rivera had "earned" for killing Miranda.

To the extent that defendants' claim hinges on the essential argument that it was Acosta alone who identified the voices as described in the transcriptions, this overlooks the extensive testimony from Agent Moore and linguist Rodriguez about the countless hours they spent working with Acosta, not to mention the express testimony from MS-13 gang member Espinal who listened to the recording of the conversations and identified the voices of Aguilera and Rivera—and who, Aguilera's counsel acknowledged at the motion for new trial, was a person "able to recognize voices." And commenting on the credibility of Acosta at the hearing on the motions for new trial, Judge Kahn had this to say: "I simply disagree. It's clear that Mr. Acosta has led a deplorable, horrific life and has committed—I'm just repeating myself—deplorable and horrific crimes, but that does not mean that, in my view, that the testimony he gave, with regard to the events that happened later on in the day of the killing of Ivan Miranda is not to be believed. I think the testimony, in my view, was credible."

Finally, defendants' argument that Judge Kahn erred in not holding an evidentiary hearing also fails.

The Supreme Court distilled the law in *People v. Dykes* (2009) 46 Cal.4th 731, 809–810: "The trial court is vested with broad discretion to act upon a motion for new trial. [Citation.] . . . [¶] The trial court has discretion to determine whether to conduct an evidentiary hearing to resolve factual disputes raised by a claim of juror misconduct. [Citation.] 'Defendant is not, however, entitled to an evidentiary hearing as a matter of right. Such a hearing should be held only when the court concludes an evidentiary hearing is "necessary to resolve material, disputed issues of fact." [Citation.] "The hearing . . . should be held only when the defense has come forward with evidence demonstrating a strong possibility that prejudicial misconduct has occurred. Even upon such a showing, an evidentiary hearing will generally be unnecessary unless the parties' evidence presents a material conflict that can only be resolved at such a hearing." [Citations.]' [Citation.] The trial court's decision whether to conduct an evidentiary hearing on the issue of juror misconduct will be reversed only if the defendant can demonstrate an abuse of discretion. [Citations.] [Fn. omitted.]" (Accord, *People v. Hedgecock* (1990) 51 Cal.3d 395, 415.) No such showing has been made here.

It is probably enough to note attorney Whelan's candid concession at the argument on the motions for new trial, his agreement "that the affidavits at this stage do not create a presumption or anything close to it of prejudice." Beyond that, there was no conflict, let alone material conflict, in the evidence. Judge Kahn properly denied the request for an evidentiary hearing, since he could make a reliable ruling on the evidence in front of him.

*Cabrera, supra,* 230 Cal.App.3d 300 heavily relied on by Aguilera (and in whose brief Rivera joins), is easily distinguishable, as there a Spanish speaking juror *disputed* the court interpreter's translation of a witness's testimony. In the words of the court: . . . "Juror Leon committed misconduct by failing to rely on the court interpreter's translation, as she promised she would during voir dire. She committed further misconduct by sharing her personal translation with her fellow jurors thus introducing outside evidence into their deliberations." (*Id.* at p. 304.) *Cabrera* has been cited for the

17

proposition that "It is misconduct for a juror to rely on her own translation instead of the interpreter's translation." (*People v. Cardenas* (2007) 155 Cal.App.4th 1468, 1472, fn. 4; see also *People v. Gonzales* (2008) 165 Cal.App.4th 620, 625, fn. 7.) Here, Juror No. 10 did not rely "on her own translation."

In any event, the Court of Appeal in *Cabrera* held the trial court did not abuse its discretion in failing to conduct an evidentiary hearing into the claimed misconduct. (*Cabrera, supra,* 230 Cal.App.3d at pp. 306–307.) Doing so, the court relied on *Hedgecock, supra,* 51 Cal.3d at pp. 415–416, that such a hearing "should be held only when the defense has come forward with evidence demonstrating a strong possibility that prejudicial misconduct has occurred." (*Cabrera, supra,* 230 Cal.App.3d at p. 306.) No such demonstration was made here.

**The 10-Year Gang Enhancement**

The jury found the gang allegations true. Judge Kahn imposed a term of 10 years for the gang allegation as to the murder conviction in count one. Both defendants claim this was error, relying on section 186.22, subdivision (b)(5), which they claim mandates that when the underlying felony carries a life sentence, the court must impose the 15-year parole minimum rather than the 10-year enhancement.[5] Thus, defendants contend that under *People v. Lopez* (2005) 34 Cal.4th 1002, 1007, the sentences should be modified to strike the 10-year enhancement as to count one and impose instead the 15-year minimum parole requirement.

The People concede that the sentence was improper, but submit the matter should be remanded to allow the trial court to resentence by increasing the sentences on the other counts. Moreover, the People assert "while the abstract of judgment should be modified to eliminate the 10-year enhancement term, the fact of the true finding [i.e., the allegation

---

[5] Section 186.22 reads in relevant part: "Except as provided in paragraph (4), any person who violates this subdivision in the commission of a felony punishable by imprisonment in the state prison for life shall not be paroled until a minimum of 15 calendar years have been served." (§ 186.22, subd. (b)(5).)

found true by the jury which furnishes the basis for the enhancement term] should remain on the document, given its relevance to parole issues."

On this point we follow the lead of our Supreme Court, which in *Lopez* simply directed a modification "to delete the 10-year gang enhancement imposed under Penal Code section 186.22(b)(1)(C)." (*People v. Lopez, supra,* 34 Cal.4th at p. 1011.) More than that we do not think appropriate. The only reported decision comparable to our situation is *People v. Williams* (2014) 227 Cal.App.4th 733, where the defendant was convicted of multiple non-capital offenses resulting in an aggregate prison term of 93 years to life. None of the substantive offenses was overturned. Pursuant to *Lopez*, the Court of Appeal deleted the ten-year enhancements on the "Three Strikes" 25-years-to-life sentences, but no resentencing was ordered. (*Id.* at p. 745.) The court also noted: "The jury's true findings on the gang enhancements remain as they are supported by substantial evidence. The Board of Parole Hearings may consider these findings when determining defendant's release date." (*Id.*, fn. 11.) And the "Mandatory Use Judicial Council" abstract specifically directs the preparer "DO NOT LIST ANY STRICKEN ENHANCEMENT(S)." The People's request that "the fact of the true finding should remain on the document" must therefore be denied. As for the relevance of those findings to "parole issues," we think it safe to assume that when defendants become eligible for parole in 2038 the Board of Parole Hearings will be made aware that defendants' offenses were gang-related.

### DISPOSITION

The judgments are modified to delete the ten-year enhancement imposed under Penal Code section 186.22(b)(1)(C) on count one. As so modified, the judgments are affirmed. The clerk of the Superior Court is directed to prepare amended abstracts of judgment and to forward certified copies to the Department of Corrections and Rehabilitation.

_____
Richman, Acting P.J.

We concur:


_____
Stewart, J.


_____
Miller, J.